UNITED STATES DISTRICT COURT

DISTRICT OF OREGON

PORTLAND DIVISION

DAVID W. SHADDON,

            Plaintiff,

    v.

COMMISSIONER OF THE SOCIAL
SECURITY ADMINISTRATION,

            Defendant.

Case No.  3:11-cv-6150 -ST

FINDINGS AND
RECOMMENDATION

STEWART, Magistrate Judge:

## INTRODUCTION

Plaintiff, David W. Shaddon ("Shaddon"), seeks judicial review of the final decision by the Social Security Commissioner ("Commissioner") denying his applications for Disability Insurance Benefits ("DIB") under Title II of the Social Security Act ("SSA"), 42 USC §§ 401-433, and Supplemental Security Income ("SSI") under Title XVI of the SSA, 42 USC §§ 1381-1383f.  This court has jurisdiction to review the Commissioner's decision pursuant to 42 USC § 405(g) and § 1383(c)(3).  For the reasons set forth below, that decision should be REVERSED and REMANDED for further proceedings.

## ADMINISTRATIVE HISTORY

Shaddon protectively filed for DBI and SSI on July 25, 2006, alleging a disability onset date of June 8, 2006.  Tr.  130-37.[1]  His applications were denied initially and on reconsideration.  Tr. 81-97.  On March 19, 2009, a hearing was held before Administrative Law Judge ("ALJ") Gary Elliot.  Tr. 33-57.  The ALJ issued a decision on June 29, 2009, finding Shaddon not disabled.  Tr. 24-32.  The Appeals Council denied a request for review on March 2, 2011. Tr. 1-4.  Therefore, the ALJ's decision is the Commissioner's final decision subject to review by this court.  20 CFR § 410.670a.

## BACKGROUND

Born in October 1963, Shaddon was 45 years old at the time of the hearing before the ALJ.  Tr. 38.  He completed the eleventh grade and had worked as a patrol security guard, automobile parts delivery truck driver, and automobile service station supervisor.  Tr. 40, 51-52.  Shaddon alleges that he is unable to work due to the combined impairments of coronary artery disease, status post coronary artery bypass grafting, hypertension, obesity, and osteoarthritis of the left knee.  Tr. 26, 150.

## I.   Medical Records

### A.   Before Onset Date

In 2003, Shaddon had a coronary artery bypass graft.  Tr. 350, 365.

In January 2004, Shaddon slipped and fell, straining his left knee.  Tr. 304.  Prior to the fall, he had surgery on this knee which had been doing well.  Tr. 358, 360.  An MRI on February 4, 2004, showed grade 4 chondromalacia "probably related to the injury," tear of the lateral meniscus from an older injury, bone marrow edema on both sides of the

---

[1]  Citations are to the page(s) indicated in the official transcript of the record filed on October 5, 2011 (docket # 12).

tibiofibular joint, mild inflammatory changes in the adjacent muscle structures, and bone marrow edema in the posterior medial femoral condyle. Tr. 410-11.  Although his physician recommended a total knee replacement, Shaddon did not follow up and continued to suffer intermittent knee pain.  Tr. 277, 360.

In December 2005, increasing knee pain caused Shaddon to visit the emergency room.  Tr. 277.  Based on effusion of the knee and an inability to completely straighten or relax it, Mural Nishikawa, M.D., rendered a diagnosis of chondromalacia.[2]  Tr. 360. Another MRI on December 20, 2005, revealed advanced degeneration of the lateral joint compartment and of the interior horn of the lateral meniscus.  Tr. 401.  A cortisone injection in January 2006 was not helpful, leading to the conclusion that he may need chronic narcotics.  Tr. 358.  His primary care physician, David R. Maslen, M.D., prescribed Vicodin.  *Id.*  In May 2006, Shaddon suffered an acute left knee contusion and sprain after being hit by a car at a slow speed.  Tr. 266-67.

### B.    After Onset Date

On June 8, 2006, Shaddon visited the emergency room for severe chest pain and numbness in the left upper extremity and was diagnosed with costochondritis.[3]  Tr. 244, 249, 251.  The pain continued, and on June 13, 2006, Dr. Maslen gave him an injection of Depo-Medrol and lidocaine.  Tr. 356.  The following week, Dr. Nishikawa suggested that his pain might be musculoskeletal in origin, rather than cardiac.  Tr. 354.  Dr. Nishikawa

---

[2]  Chondromalacia patella is damage to the cartilage under the kneecap.  http://www.mayoclinic.com/health/chondromalacia-patella/DS00777 (last visited June 22, 2012).

[3]  Costochondritis "is an inflammation of the cartilage that connects a rib to the breastbone (sternum)." It causes sharp pain in the costosternal joint between the ribs and breastbone which "may mimic that of a heart attack or other heart conditions."  http://www.mayoclinic.com/health/costochondritis/DS00626 (last visited June 22, 2012).

also prescribed Percocet and conferred with Shaddon's cardiologist who decided to perform

an angiography to rule out coronary artery disease.  *Id.*

On July 17, 2006, Shaddon returned to the hospital with severe chest pain radiating

to his jaw.  Tr. 234-36.  Three days later, he entered the hospital again for crushing chest

pain and was diagnosed with chest pain, coronary artery disease, possible costochondritis,

diabetes and osteoarthritis.  Tr. 313-18.

On August 9, 2006, Shaddon reported to Dr. Maslen that Vicodin was not helping his

knee pain and that an orthopedic surgeon had advised that he was too young for knee

replacement surgery.  Tr. 349.  Dr. Maslen prescribed Oxycontin and a cane.  *Id.*  On

August 22, 2006, Dr. Maslen wrote to the agency that Shaddon has:

> a reduced injection fraction of 41% demonstrated on a nuclear study in
> 2006. . . . [He] also suffers from osteoarthritis, particularly the knees
> in addition to type 2 diabetes. . . . [H]e is significantly handicapped
> and it would probably be difficult for him to lift more than 10 to 15
> pounds repeatedly more than 2 or 3 hours a day.  Similarly, carrying,
> handling, walking, *etc*. would probably be difficult associated with
> loads over 5 to 10 pounds for periods of time over 3 to 4 hours during
> the day.

Tr. 350.

On September 5, 2006, Shaddon again reported knee and chest wall pain.  Tr. 348.

Dr. Maslen diagnosed chronic pain syndrome and again prescribed Vicodin. *Id.*  He gave

Shaddon a note for work stating that:  "We do not feel that he can lift greater than 10

pounds for long periods of time at work and we do feel this is a chronic disability in this

case." *Id.*

On October 6, 2006, Shaddon reported a decreased libido, sadness, irritability,

obsessive thinking, sleep disorder, and eating disorder.  Tr. 346.  He had just obtained

insurance.  *Id.*  Dr. Maslen again diagnosed chronic pain syndrome, as well as depression,

type II diabetes, osteoarthritis of the knee, and prescribed Fluoxetine (Prozac). *Id.* Later that month, Shaddon reported to Dr. Nishikawa that he was experiencing more knee pain. Tr. 345. His knee was swollen and locking-up with no ability to straighten or relax due to the pain. *Id.* Dr. Nishikawa warned against taking too much Vicodin and recommended treatment with ice. *Id.*

On January 8, 2007, Dr. Maslen again wrote to the agency, explaining that treatment of Shaddon's anterior chest pain syndrome with injections, physical therapy, nonsteroid anti-inflammatories and icing had not been helpful. Tr. 341. He noted that Shaddon frequently visited the emergency room because of his pain and added: "When lifting greater than 10 pounds he will often have this pain syndrome. . . .  With regards to the patient's functional ability my guess is that he will not be able to lift greater than 5 pounds, on a frequent basis in the future. His ejection fraction of 40% also decreases his stamina." *Id.*

On January 12, 2007, Dr. Maslen noted that Shaddon had received multiple prescriptions and filled them "out of phase at various pharmacies." Tr. 340. For example, in January 2006, he filled a prescription for Vicodin at Rite-Aid and then filled another prescription the next day at Safeway. *Id.* Dr. Maslen told him the clinic would no longer prescribe him narcotics. *Id.*

Shaddon periodically sought treatment in emergency rooms over the next few years for his chest and knee pain. In May 2007, Shaddon was hospitalized for five days for chest pain. Tr. 440-41. He reported intermittent tingling in his left arm associated with jaw pain and tightening in his chest. Tr. 450. Bradley Evans, M.D., requested a neurologic evaluation. Tr. 447. Lehel Somogyi, M.D., felt that the findings did not adequately explain his chest tightness and suggested a possible gastrointestinal component. Tr. 450-51.

Shaddon also reported numbness in his upper extremities and was found to have decreased pin prick in all of his fingers up to the palm level, indicating a possible bilateral carpal tunnel syndrome. Tr. 447-49. There was "very little to suggest that he actually has a neurologic diagnosis, such as a myelopathy, stroke, radiculopathy or neuropathy." Tr. 449. Shaddon was discharged with a plan for aggressive medical treatment for coronary artery disease. Tr. 446. The neurologist felt that Shaddon may have carpal tunnel syndrome and a gastrointestinal component to his pain, while the "etiology of his chest discomfort remains obscure." Tr. 440-41.

In October 2007, he was admitted for observation of chest pressure that had lasted four to five days. Tr. 430-32. An EKG was normal (Tr. 431), and he was advised to quit smoking as it was intensifying upper respiratory infections. Tr. 429. In November 2008, Shaddon sought treatment for cough, chest pain and shortness of breath. Tr. 635. He could not afford his medications and had not been taking them for some time. *Id.* He reported pain in his right shoulder, radiating into his neck. *Id.* He had no acute ischemia. Tr. 636.

In January 2009, he again sought treatment for left knee pain. Tr. 623. An x-ray revealed moderate degenerative narrowing of the medial and lateral compartments of the knee, with mild flattening and irregularity of the articular surface of the lateral femoral condyle with some surrounding sclerosis and small joint effusion. Tr. 625. Once again he was prescribed Vicodin. Tr. 624.

In April 2009, Shaddon again sought treatment for chest pain. Tr. 502. He was found to have strong risk factors for coronary disease in light of his history of myocardial infarction with ongoing tobacco abuse and the fact that he was not currently taking his medications. Tr. 505. The treating doctor noted that noncompliance and financial issues

were "a barrier to [his] care," but Shaddon reported that he was "ready and motivated to begin taking medications." *Id.*

At the request of the agency, Kurt Brewster, M.D., examined Shaddon on April 13, 2009.  Tr. 473-91.  Shaddon reported ongoing chest pain, particularly with exertion, and shortness of breath "occurring after walking one block or six to seven stairs."  Tr. 486.  He was smoking half a pack of cigarettes a day.  Tr. 488.  Dr. Brewster diagnosed cardiac symptoms, but no cardiac dysfunction.  Tr. 491.  He stated he would await the results from the McKenzie-Willamette treadmill test, but given the lack of findings other than pain, "found minimal indication to limit [Shaddon] to the degree estimated."  *Id.*   He concluded that Shaddon could frequently lift and carry up to 10 pounds and occasionally up to 20.  Tr. 492.  He could sit for two hours at a time and stand or walk one hour at a time without interruption, and sit for four hours and stand and walk for two hours each total in an eight hour work day.  Tr. 493.  He could only occasionally reach overhead with the left hand.  Tr. 494.

## II.    **Hearing Testimony**

### A.    **Shaddon**

Shaddon testified that since his alleged onset date of June 8, 2006, he had worked for temporary employment agencies, doing crowd control management work and general labor.  Tr. 39-40.  However, he found that work difficult because of problems climbing stairs, breathing, and keeping up.  Tr. 40-41.  He cannot afford his medication and has no health insurance.  Tr. 42.  He can walk to the end of the building or hallway, but then needs to rest for couple of minutes.  *Id.*  He can sit for about 30 minutes and then must get up and move around because of his knee.  Tr. 43.  After working for four or five hours, his knee becomes

swollen; elevating his legs helps.  Tr. 43-44.  He often feels pressure in his heart (Tr. 40-41)

which sometimes feels like a heart attack.  Tr. 44.  He sometimes has difficulty reaching

overhead.  *Id.*  He can lift about 10 pounds about three or four times in half an hour.  Tr. 45.

### B.      Vocational Expert

The ALJ asked the vocational expert ("VE") to consider a hypothetical person with

the following limitations:  occasionally lift 10 pounds, and frequently less than 10 pounds;

stand and/or walk for about two hours and sit for about six hours in an 8-hour work day;

occasionally push and pull with the left lower extremity; not climb ladders, ropes or

scaffolds; occasionally climb ramps or stairs or balance, kneel, crouch and crawl; and avoid

even moderate exposure to any hazards such as heights or moving machinery.  Tr. 53.  The

VE testified that such a person could not return to Shaddon's past relevant work, but could

perform the sedentary jobs of small products assembler, cashier, or telephone survey call

center worker.  Tr. 53-55.

The ALJ then asked the VE to consider the same hypothetical person, but who would

be unable to stand or walk for two hours and sit for less than six hours in an 8-hour day.

Tr. 55-56.  The VE testified that this restriction would rule out competitive employment.  *Id.*

## III.   Post-Hearing Evidence

On November 10, 2009, after the ALJ's decision, David Truhn, Psy.D., examined

Shaddon.  Tr. 668-75.  Dr. Truhn noted that Shaddon's hygiene was poor, and his affect was

flat.  Tr. 668.  He tended to blurt out answers in response to questions. *Id.*  Shaddon reported

that he had been depressed "since he has been in trouble" and missed his daughter, waking

up thinking about her.  *Id.*  He was arrested for domestic violence over two years ago and

was still on probation.  Tr. 671.

He reported feelings of hopelessness and helplessness at times and a low energy level for the past year or so.  Tr. 668.  He had low self-esteem because he could not afford a place to take his children.  *Id.* When stressed, he has difficulty breathing and was frightened of "falling over dead."  Tr. 669.  He had low motivation.  *Id.*  His inability to accomplish tasks was "depressing," and he could not do much because of pain.  Tr. 670.  He has never attended counseling or been hospitalized for mental health reasons, and had been taking Prozac for the last two years.  *Id.*

Testing revealed a full-scale IQ of 72.  Tr. 671.  Shaddon scored in the borderline range on verbal comprehension, perceptual reasoning, and processing speed.  *Id.*  He appeared to be a "concrete thinking individual" who needs information "presented to him in a concrete fashion with examples."  *Id.*  His knowledge and use of vocabulary words fell "in the extremely low range of abilities," such that "any verbal communication would have to take place on a simplistic level."  Tr. 671-72.  The neuropsychological screening test was "indicative of cognitive slowing."  Tr. 672.  His reading and spelling abilities were "about the third grade level and at the extremely low range of abilities."  *Id.*

Shaddon's profile on the MMPI-II was valid, "indicating that he responded in a similar fashion to individuals who are mildly defensive and are attempting to present themselves in a positive light."  *Id.* Testing indicated "a significant amount of psychological distress" and "a classic conversion profile."  *Id.*  Individuals with this profile report "a reduced level of functioning" which may include "headaches, chest pain, and numbness of the extremities.  They may have gastrointestinal problems, fatigue, weakness, and sleep disturbances.  The physical symptoms often increase under periods of stress, and there is clear secondary gain associated with the symptoms."  Tr. 672-73.

9 - FINDINGS AND RECOMMENDATION

Because Shaddon had been diagnosed with medical problems, Dr. Truhn ruled out a conversion disorder.[4]  Tr. 674.  Instead, he diagnosed a pain disorder[5] associated with both psychological factors and a generalized medical condition, chronic; generalized anxiety disorder; dysthymic disorder, late onset; and dependent features with  borderline intellectual functioning. Tr. 673.  He assigned a GAF of 43.[6]  Tr. 674.  Accordingly, Dr. Truhn opined that Shaddon "would be unable to work at this time, given his severe psychological issues.  The intellectual functioning may be affected by some of the psychological factors although would probably remain relatively stable." *Id.*  Due to his psychological profile, Dr. Truhn believed "psychotherapy would have limited results," but, nonetheless, recommended "psychotherapy and a day activity program to help him structure his time and to benefit from individual and group therapy in a supportive milieu." *Id.*  He concluded that Shaddon's "prognosis is poor.  His situations and diagnoses were chronic and he would have limited response to therapeutic intervention."  Tr. 675.

Dr. Truhn also completed a Mental Residual Functional Capacity Questionnaire (Tr. 676-80), stating that Shaddon was "markedly limited" in his ability to:  understand and remember and carry out detailed instructions; maintain attention and concentration for extended periods; perform activities within a schedule; maintain regular attendance and be

---

[4]  Traditionally, the term conversion derived from the hypothesis that the individual's somatic symptom represents a symbolic resolution of an unconscious psychological conflict, reducing anxiety and serving to keep the conflict out of awareness.  *Diagnostic and Statistical Manual of Mental Disorders*, 4th Edition ("DSM-IV"), pp. 452-54.

[5]  The essential feature of Pain Disorder is pain that is the predominant focus of the clinical presentation and is of sufficient severity to warrant clinical attention.  DSM-IV, p. 458. The pain causes significant distress or impairment in social, occupational, or other important areas of functioning.  *Id.*  Psychological factors are judged to play a significant role in the onset, severity, exacerbation or maintenance of the pain, but the pain is not intentionally produced or feigned as in Factitious Disorder or Malingering. *Id.*  Laboratory tests may reveal pathology that is associated with the pain. *Id.*

[6]  A global assessment of functioning ("GAF") in the 41-50 range indicates serious symptoms or any serious impairment in social, occupational, or school functioning.  DSM-IV, p. 34.

punctual within customary tolerances; sustain an ordinary routine without special

supervision; complete a normal workday and work week without interruptions from

psychologically based symptoms and to perform at a consistent pace without an

unreasonable number and length of rest periods; and maintain socially appropriate behavior

and adhere to basic standards of neatness and cleanliness.  Tr. 677-78.  He also identified

numerous moderate mental limitations.  *Id.*

Dr. Truhn also completed a Rating of Impairments Severity Report (Tr. 681-85),

stating that Shaddon had marked limitations in restriction in activities of daily living;

moderate limitations in social functioning; marked limitations in concentration, persistence

or pace; and four or more episodes of decompensation with frequent brief episodes and

decreased level of functioning.  Tr. 681-82.  He stated that Shaddon demonstrated a residual

disease process that resulted in such marginal adjustment that even a minimal increase in

mental demands or change in the environment would be predicted to cause him to

decompensate.  Tr. 682.

In a letter to Shaddon's counsel dated March 17, 2010, Dr. Truhn opined that

Shaddon's onset date preceded June 8, 2006:

> Individuals with a pain disorder often have a lack of psychological
> mindedness and insight into their symptoms and chronically respond to
> stress with physical problems.  It is this examiner's hypothesis that as
> he has had that pattern of dealing with stress throughout his life, but
> that he has been marginally able to maintain employment with
> significant support from family members or significant others.  As his
> marriage deteriorated, he lived independently [and] was unable to
> maintain that status and returned to live with his mother, reflective of
> the high dependency needs in relationships.  As his stressors have
> grown over the years, as well as medical problems, he has responded
> to that stress with the exaggerated pain response.  It is this examiner's
> opinion that he has experienced the pain disorder since at least June 8,
> 2006, but probably had a similar coping pattern prior to that, although
> it may not have been as invasive in his level of functioning because of

the additional supports he had in his life prior to that time. . . . The combination of all of these diagnoses, intellectual limitations, and patterns of coping culminated in his current inability to maintain employment.

Tr. 685.

## **DISABILITY ANALYSIS**

Disability is the "inability to engage in any substantial gainful activity by reason of any medically determinable physical or mental impairment which can be expected to result in death or which has lasted or can be expected to last for a continuous period of not less than 12 months[.]" 42 USC § 423(d)(1)(A). The ALJ engages in a five-step sequential inquiry to determine whether a claimant is disabled within the meaning of the Act. 20 CFR §§ 404.1520, 416.920; *Tackett v. Apfel*, 180 F3d 1094, 1098-99 (9th Cir 1999).

At step one, the ALJ determines if the claimant is performing substantial gainful activity. If so, the claimant is not disabled. 20 CFR §§ 404.1520(a)(4)(i) & (b), 416.920(a)(4)(i) & (b).

At step two, the ALJ determines if the claimant has "a severe medically determinable physical or mental impairment" that meets the 12-month durational requirement. 20 CFR §§ 404.1520(a)(4)(ii) & (c), 416.909, 416.920(a)(4)(ii) & (c). Absent a severe impairment, the claimant is not disabled. *Id*.

At step three, the ALJ determines whether the severe impairment meets or equals an impairment "listed" in the regulations. 20 CFR §§ 404.1520(a)(4)(iii) & (d), 416.920(a)(4)(iii) & (d); 20 CFR Pt. 404, Subpt. P, App. 1 (Listing of Impairments). If the impairment is determined to meet or equal a listed impairment, then the claimant is disabled.

If adjudication proceeds beyond step three, the ALJ must first evaluate medical and other relevant evidence in assessing the claimant's residual functional capacity ("RFC"). The claimant's RFC is an assessment of work-related activities the claimant may still perform on a regular and continuing basis, despite the limitations imposed by his or her impairments.  20 CFR §§ 404.1520(e), 416.920(e); Social Security Ruling ("SSR") 96-8p, 1996 WL 374184 (July 2, 1996).

At step four, the ALJ uses the RFC to determine if the claimant can perform past relevant work.  20 CFR §§ 404.1520(a)(4)(iv) & (e), 416.920(a)(4)(iv) & (e).  If the claimant cannot perform past relevant work, then at step five, the ALJ must determine if the claimant can perform other work in the national economy.  *Bowen v. Yuckert*, 482 US 137, 142 (1987); *Tackett v. Apfel*, 180 F3d 1094, 1099 (9th Cir 1999); 20 CFR §§ 404.1520(a)(4)(v) & (g), 416.920(a)(4)(v) & (g).

The initial burden of establishing disability rests upon the claimant. *Tackett*, 180 F3d at 1098.  If the process reaches step five, the burden shifts to the Commissioner to show that jobs exist in the national economy within the claimant's RFC.  *Id*.  If the Commissioner meets this burden, then the claimant is not disabled.  20 CFR §§ 404.1520(a)(4)(v) & (g), 404.1560(c), 416.920(a)(4)(v) & (g), and 416.960(c).

## **ALJ'S FINDINGS**

At step one, the ALJ concluded that Shaddon has not engaged in substantial gainful activity since June 8, 2006.  Tr. 26.

At step two, the ALJ determined that Shaddon has the severe impairments of coronary artery disease, status post coronary artery bypass grafting, hypertension, obesity, and osteoarthritis of the left knee.  *Id.*

13 - FINDINGS AND RECOMMENDATION

At step three, the ALJ concluded that Shaddon does not have an impairment or combination of impairments that meets or equals any of the listed impairments.  Tr. 26-27. The ALJ found that Shaddon has the RFC to lift 10 pounds occasionally and less than 10 pounds frequently; can stand and or/walk for a total of about 2 hours in an 8-hour workday and sit for a total of about 6 hours in an 8-hour workday; is limited to occasional pushing and pulling with lower left extremity; should not climb ladders, ropes, or scaffolds but can occasionally climb ramps and stairs and occasionally balance, kneel, crouch, and crawl; and should avoid even moderate exposure to hazards such as heights and moving machinery. Tr. 27.

Based upon the VE's testimony, the ALJ determined at step four that Shaddon's RFC precluded him from returning to his past relevant work.  Tr. 31.

At step five, the ALJ found that considering Shaddon's age, education, and RFC, he was capable of performing the  jobs of small products assembly, cashier, and telephone survey worker.  Tr. 32.

Accordingly, the ALJ determined that Shaddon was not disabled at any time through the date of the decision.

## STANDARD OF REVIEW

The reviewing court must affirm the Commissioner's decision if it is based on proper legal standards and the findings are supported by substantial evidence in the record.  42 USC § 405(g); *Lewis v. Astrue*, 498 F3d 909, 911 (9th Cir 2007).  This court must weigh the evidence that supports and detracts from the ALJ's conclusion.  *Lingenfelter v. Astrue*, 504 F3d 1028, 1035 (9th Cir 2007), citing *Reddick v. Chater*, 157 F3d 715, 720 (9th Cir 1998). The reviewing court may not substitute its judgment for that of the Commissioner.  *Ryan v.*

14 - FINDINGS AND RECOMMENDATION

*Comm'r of Soc. Sec. Admin.*, 528 F3d 1194, 1205 (9th Cir 2008), citing *Parra v. Astrue*, 481

F3d 742, 746 (9th Cir 2007); *see also Edlund v. Massanari*, 253 F3d 1152, 1156 (9th Cir

2001).  Where the evidence is susceptible to more than one rational interpretation, the

Commissioner's decision must be upheld if it is "'supported by inferences reasonably drawn

from the record.'"  *Tommasetti v. Astrue*, 533 F3d 1035, 1038 (9th Cir 2008), *quoting Batson*

*v. Comm'r of Soc. Sec. Admin.*, 359 F3d 1190, 1193 (9th Cir 2004); *see also Lingenfelter*,

504 F3d at 1035.

## FINDINGS

### I.    Post-Hearing Evidence

With his request for review to the Appeals Council, Shaddon submitted Dr. Truhn's

medical records and opinions.  Although the Appeals Council received and reviewed this

evidence, "making it part of the record" (Tr. 6), it discounted that evidence as follows:

> These records and opinions were generated after the date of decision,
> and therefore, do not affect the decision about whether you were
> disabled beginning on or before June 29, 2009.  Even assuming the
> information relates to the period at issue before the [ALJ], the opinions
> are inconsistent with the evidence as a whole, including records
> indicating that you worked steadily from 1984-2002 as a manager of a
> gasoline station, supervising others.

Tr. 2.

### A.    New and Material Evidence

A claimant may submit new and material evidence to the Appeals Council when

requesting review of an ALJ's decision, provided that the evidence relates to the period on

or before the ALJ's decision.  20 CFR §§ 404.970(b), 416.1470(b); *Perez v. Chater*, 77 F3d

41, 45 (2nd Cir 1996).

As Shaddon correctly argues, the Appeals Council erred by finding that Dr. Truhn's records did not "affect the decision about whether [he was] disabled beginning on or before June 29, 2009." Shaddon alleges that his disability began on June 8, 2006, not June 29, 2009. Moreover, Dr. Truhn concluded that Shaddon was limited by lifelong mental conditions and that his pain disorder had been disabling since 2006. Tr. 685. Assessments completed retrospectively are probative evidence that should be considered. *Smith v. Bowen,* 849 F2d 1222, 1225-26 (9th Cir 1988). Dr. Truhn specifically addressed Shaddon's mental functioning during the relevant adjudicatory period.[7] Thus, contrary to the conclusion by the Appeals Council, his opinion clearly relates to the time period before the ALJ.

**B.   Substantial Evidence**

Despite that error, the Commissioner argues that the Appeals Council properly rejected Dr. Truhn's opinion "as inconsistent with the evidence as a whole." Tr. 2. When rejecting post-hearing evidence, "the Appeals Council is not required to make any particular evidentiary finding." *Gomez v. Chater*, 74 F3d 967, 972 (9th Cir 1996). If the Appeals Council examines the entire record and concludes that the new evidence did not "provide a basis for changing the hearing decision," courts may consider the new evidence and determine whether substantial evidence supports the ALJ's decision. *Ramirez v. Shalala*, 8 F3d 1449, 1452 (9th Cir 1993).

---

[7] The Commissioner argues that 42 USC § 405(g) requires Shaddon to show good cause for his failure to produce this additional evidence earlier. That argument is misplaced. The good cause requirement of 42 USC § 405(g) applies to a failure to "incorporate [new] evidence into the record in a prior proceeding," not to this case involving new evidence submitted to the Appeals Council in the same proceeding.

To show that Dr. Truhn's opinion does not undermine the ALJ's decision, the Commissioner points to several inconsistencies. As one example specifically mentioned by the Appeals Council, Shaddon worked from 1984-2002 as a manager of a gasoline station which the VE characterized as skilled work. Tr. 48, 52, 141-48. Such an ability is arguably inconsistent with Dr. Truhn's opinion that Shaddon had a lifelong borderline intellectual functioning and chronic cognitive symptoms due to anxiety. Tr. 684-85. However, Dr. Truhn explained that Shaddon was able to work during that time due to "significant support from family members or significant others." Tr. 685. But as his marriage deteriorated and "his stressors have grown over the years, as well as his medical problems, he has responded to that stress with the exaggerated pain response." *Id.* The Appeals Council failed to acknowledge or in any way discount this explanation.

As another example, the Commissioner notes that, contrary to Dr. Truhn's finding that Shaddon had marked restrictions in daily living, Shaddon's August 2006 Function Report (Tr. 187-85) states that he was able to go out alone, shop for groceries, attend his own personal grooming and care for his two youngest children. However, that characterization is not entirely accurate since Shaddon pointed out that he receives help in caring for his children. Tr. 79. The Commissioner also argues that Shaddon reported no difficulty with memory, understanding, concentration, completing tasks, and following instructions (Tr. 175, 183), contrary to Dr. Truhn's conclusion that he had a marked restriction in concentration, persistence or pace. Tr. 681. However, Dr. Truhn noted that he had limited psychological mindfulness, suggesting that he is not very self-aware. Tr. 685. Moreover, the testing revealed cognitive slowing and a low IQ. Tr. 672. Those are sufficient reasons to explain these perceived inconsistencies.

17 - FINDINGS AND RECOMMENDATION

The Commissioner also contends that Dr. Truhn's diagnosis of depression finds little support in the record.  In October 2007, Shaddon reported "no depression" to Gregory C. Ruttan, M.D., and in April 2009, Dr. Brewster described Shaddon as pleasant and not in "marked distress."  Tr. 488.  However, the record also reveals that Dr. Maslen prescribed Prozac, an anti-depressant, to Shaddon and in October 2006 noted "decreased libido, sadness, irritability, obsessive thinking, sleep disorder, eating disorder."  Tr. 346.  Thus, a diagnosis of depression is not "inconsistent with the evidence as a whole" as stated by the Appeals Council.

Based on the new evidence (Dr. Truhn's opinion), the Appeals Council erred by finding that substantial evidence supports the ALJ's decision.

## II.    Credibility Findings

Shaddon also argues that, based on the new evidence, the ALJ erred by finding that his statements concerning the intensity, persistence, and limiting effects of his symptoms are "not credible to the extent they are inconsistent" with the RFC.  Tr. 28.  The ALJ found Shaddon "not credible" because:  (1) his "allegations of disabling symptoms and limitations are inconsistent with a number of clinical findings" (Tr. 28)" (2) "the record contains evidence of cardiac treatment noncompliance: (Tr. 29); and (3) he worked "since the alleged onset date" (*id*).

### A.    Legal Standards

The ALJ must consider all symptoms and pain which can "reasonably be accepted as consistent with the objective medical evidence and other evidence."  20 CFR §§ 404.1529(a), 416.929(a).  Once a claimant shows an underlying impairment which may "reasonably be expected to produce pain or other symptoms alleged," absent a finding of malingering, the ALJ

must provide "clear and convincing" reasons for finding a claimant not credible.  *Lingenfelter,*
504 F3d at 1036, citing *Smolen v. Chater*, 80 F3d 1273, 1281 (9th Cir 1996).  The ALJ's
credibility findings must be "sufficiently specific to permit the reviewing court to conclude that
the ALJ did not arbitrarily discredit the claimant's testimony."  *Orteza v. Shalala*, 50 F3d 748,
750 (9th Cir 1995), citing *Bunnell v. Sullivan*, 947 F2d 341, 345-46 (9th 1991) (*en banc*).  The
ALJ may consider objective medical evidence and the claimant's treatment history, as well as the
claimant's daily activities, work record, and observations of physicians and third parties with
personal knowledge of the claimant's functional limitations.  *Smolen*, 80 F3d at 1284.  The ALJ
may additionally employ ordinary techniques of credibility evaluation, such as weighing
inconsistent statements regarding symptoms by the claimant.  *Id.*  The ALJ may not, however,
make a negative credibility finding "solely because" the claimant's symptom testimony "is not
substantiated affirmatively by objective medical evidence."  *Robbins v. Soc. Sec. Admin.*, 466
F3d 880, 883 (9th Cir 2006).

   **B.**    **Analysis**

       **1.**    **Objective Medical Findings**

   The ALJ found no objective medical evidence to support Shaddon's alleged cardiac
symptoms or knee pain.  He noted that in January 2007, Dr. Maslen found Shaddon's
coronary artery disease "stable."  Tr. 28, 340.  The ALJ also pointed to a prior emergency
room record from July 21, 2006, in which the physician commented that "[t]he cause of this
gentleman's recurring chest pain is difficult to sort out."  Tr. 28, 322.  In addition the ALJ
noted that in May and October 2007 after multiple emergency room visits, tests, and
treatments, Shaddon's chest pain was deemed noncardiac.  Tr. 433-35, 442.  Finally, the

19 - FINDINGS AND RECOMMENDATION

ALJ relied on Dr. Brewster's finding in April 2009 of "minimal indication to limit the claimant to the degree the claimant estimated." Tr. 28, 491.

The ALJ also discredited Shaddon based on a lack of objective evidence for his knee pain. Shaddon has osteoarthritis of the left knee and uses a cane to walk long distances. Tr. 184, 346, 349. On December 8, 2005, Shaddon visited the emergency room for knee pain. Tr. 277. Upon physical exam, the physician noted a "[d]ecreased range of motion and pain with flexion but no instability." *Id.*

According to Dr. Truhn, however, Shaddon's mental health condition plays a role in his pain. Tr. 685. As noted in *Day v. Astrue*, Civil No. 08-944-JE, 2010 WL 331777, at *14 (D Or Jan. 22, 2010), "the absence of objective findings or 'particular diagnoses or etiology'" to account for an individual's complaints is inherent in the very nature of a somatoform disorder. Those suffering from a somatoform disorder experience physical symptoms for which there are no demonstrable organic findings, and which are presumed to be linked to psychological factors." Both Shaddon's cardiac symptoms and knee pain may be intensified due to his conversion disorder/condition and "psychologically enhanced" symptoms. If Dr. Truhn's opinion is credited, then the lack of objective medical findings is not a sufficient reason to discredit Shaddon.

## 2.    **Treatment Compliance**

Failure to follow a prescribed treatment may also undermine a claimant's credibility. "[T]he individual's statements may be less credible if the level or frequency of treatment is inconsistent with the level of complaints, or if the medical reports or records show that the individual is not following the treatment as prescribed and there are no good reasons for this failure." SSR 96–7p, 1996 WL 374186, at *7 (July 2, 1996). The ALJ noted that, despite

his doctors' recommendations (Tr. 442, 455), Shaddon reported in October 2007 that he smoked half a pack of cigarettes a day (Tr. 429) and in April 2009 reported that he failed to take daily aspirin (Tr. 503).  Tr. 29.

Dr. Maslen told Shaddon in August 2006 that to preserve his health, "discontinuation of smoking is vital."  Tr. 351.  On September 5, 2006, Shaddon reported that he did not think he could stop smoking.  Tr. 348.  However, he did reduce his tobacco use.  On May 27, 2006, he reported smoking one and half packs of cigarettes a day.  Tr. 266.  By July 17, 2006, he reported smoking one pack a day.  Tr. 234.  On October 4, 2007, and again on April 13, 2009, he reported smoking half a pack of cigarettes a day.  Tr. 429, 488.  Furthermore, in October 2007, Shaddon told Dr. Horton that he was "not interested in stopping smoking because he has to do something while he is on house arrest and smoking seems to be his answer."  Tr. 428-29.  The ALJ did not address this explanation or acknowledge Shaddon's successful reduction in his amount of tobacco use.

The ALJ also overlooked the fact that in October 2007, Shaddon told Dr. Horton that he not been taking his prescription medications which had been mailed to the wrong address, but had been taking aspirin.  Tr. 428.  At best, the record shows sporadic noncompliance with respect to taking aspirin.

Thus, noncompliance with treatment is not a clear and convincing reason to discredit Shaddon.

### 3. __Reputation for Truthfulness__

The ALJ also noted "evidence of possible drug-seeking behavior, which undermines the persuasiveness of the claimants' treatment history, as well as his assertion that he is not taking his medications because he cannot afford them."  Tr. 29.  In January 2007,

Dr. Maslen stopped prescribing narcotics to Shaddon due to his refilling of Vicodin "out of phase."  Tr. 340.

When weighing the claimant's credibility, the ALJ may consider the claimant's reputation for truthfulness.  *Thomas v. Barnhart*, 278 F3d 947, 958-59 (9th Cir 2002).  Drug-seeking behavior is another well-recognized reason to discount credibility.  *Edlund v. Massanari*, 253 F3d 1152, 1157-58 (9th Cir 2001).  The ALJ correctly relied on Shaddon's prescription refills of Vicodin "out of phase" in 2006 as drug-seeking behavior.  However, in October 2007, Shaddon told Dr. Horton that he was not taking his medications, other than aspirin, because the prescriptions were sent to a different house and he did not take measures to obtain them.  Tr. 428-29.  But by April 2009, Shaddon stated that he was "ready and motivated to begin taking medications."  Tr. 505.  The ALJ failed to note either this express desire to comply or evidence in the record that "financial issues are a barrier to [his] care."  *Id.*

## 4.   <u>Activities</u>

The ALJ relied on the fact that Shaddon had worked since his alleged onset date. Tr. 29.  Although Shaddon's work "has been somewhat intermittent and does not constitute substantial gainful activity, it does suggest that the claimant's symptoms have, at least at times, not been as limiting as alleged."  *Id.*  According to Dr. Truhn, however, when Shaddon had additional support, such as his girlfriend and mother, he "has been marginally able to maintain employment."  Tr. 685.  However, without that support and "[a]s his stressors have grown over the years, as well as medical problems, he has responded to that stress with the exaggerated pain response," rendering him unemployable.  *Id.*  If Dr. Truhn's

opinion is credited, Shaddon's prior work is not a clear and convincing reason to find him not credible.

### 5.    Conclusion

In light of Dr. Truhn's records and opinion, the ALJ erred by failing to give clear and convincing reasons to support his adverse credibility finding.

## IV.    Remand

If the ALJ improperly rejected the testimony of Shaddon and Dr. Truhn, then his RFC and step five finding are invalid. *See Robbins*, 466 F3d at 886 (finding ALJ's inadequate findings concerning a claimant's limitations caused his RFC to be "legally inadequate"); *Roberts v. Shalala*, 66 F3d 179, 187 (9th Cir 1995) (the ALJ can meet his burden at step five "by propounding to a vocational expert a hypothetical that reflects all the claimant's limitations."), *cert denied*, 517 US 1122 (1996).

The decision whether to remand for further proceedings or for immediate payment of benefits is within the discretion of the court. *Harman v. Apfel*, 211 F3d 1172, 1178 (9th Cir), *cert denied,* 531 US 1038 (2000). The issue turns on the utility of further proceedings. A remand for an award of benefits is appropriate when no useful purpose would be served by further administrative proceedings or when the record has been fully developed and the evidence is insufficient to support the Commissioner's decision. *Strauss v. Comm'r of the Social Sec. Admin.*, 635 F3d 1135, 1138-39 (9th Cir 2011), quoting *Benecke v. Barnhart*, 379 F3d 587, 593 (9th Cir 2004). The court may not award benefits punitively, and must conduct a "credit-as-true" analysis to determine if a claimant is disabled under the Act. *Id* at 1138.

Under the "crediting as true" doctrine, evidence should be credited and an immediate award of benefits directed where "(1) the ALJ failed to provide legally sufficient reasons for

rejecting the evidence, (2) there are no outstanding issues that must be resolved before a determination of disability can be made; and (3) it is clear from the record that the ALJ would be required to find the claimant disabled were such evidence credited." *Id.* The "crediting as true" doctrine is not a mandatory rule in the Ninth Circuit, but leaves the court flexibility in determining whether to enter an award of benefits upon reversing the Commissioner's decision. *Connett v. Barnhart*, 340 F3d 871, 876 (9th Cir 2003), citing *Bunnell*, 947 F2d at 348. The reviewing court declines to credit testimony when "outstanding issues" remain. *Luna v. Astrue*, 623 F3d 1032, 1035 (9th Cir 2010).

The ALJ's decision is not based on substantial evidence because it does not consider the new evidence from Dr. Truhn. Therefore, the ALJ's subsequent RFC assessment and hypothetical questions to the vocational expert at step five in the sequential disability analysis are not based upon the proper legal standards. However, it is not clear from the record that crediting the omitted evidence establishes that Shaddon is disabled at step five in the sequential proceedings.

In such instances, awarding benefits is inappropriate. *Harman*, 211 F3d at 1180; *see also Luna*, 623 F3d at 1035. The matter must be remanded for further proceedings to develop the record regarding Shaddon's mental impairments, considering the totality of the medical record including Dr. Truhn's new evidence. If necessary, the ALJ must then revise his RFC determination. Finally, the ALJ must make adequate step four and five findings incorporating any revised findings.

///

///

///

24 - FINDINGS AND RECOMMENDATION

## RECOMMENDATION

For the reasons discussed above, the Commissioner's decision should be

REVERSED AND REMANDED pursuant to Sentence Four of 42 USC § 405(g) for further

proceedings.

## SCHEDULING ORDER

The Findings and Recommendation will be referred to a district judge.  Objections, if

any, are due Monday, July 09, 2012.  If no objections are filed, then the Findings and

Recommendation will go under advisement on that date.

If objections are filed, then a response is due within 14 days after being served with a

copy of the objections.  When the response is due or filed, whichever date is earlier, the

Findings and Recommendation will go under advisement.

DATED June 25, 2012.


s/ Janice M. Stewart
Janice M. Stewart
United States Magistrate Judge